NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0162n.06
Case No. 18-3618

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| RICHARD KOYO, | ) | **FILED** |
|  | ) | Apr 01, 2019 |
| Petitioner, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
|  | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
|  | ) | BOARD OF IMMIGRATION |
| WILLIAM P. BARR, Attorney General, | ) | APPEALS |
|  | ) |  |
| Respondent. | ) |  |

BEFORE: CLAY, McKEAGUE, and WHITE, Circuit Judges.

CLAY, Circuit Judge. Petitioner Richard Philemon Koyo seeks review of a final order of removal issued by the Board of Immigration Appeals ("BIA") on June 4, 2018, affirming the Immigration Judge's ("IJ") denial of Koyo's application for asylum, under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(b); withholding of removal, under 8 U.S.C. § 1231(b)(3)(A); and Convention Against Torture ("CAT") protection, under 8 C.F.R. § 1208.16. For the reasons set forth below, we **DENY** Koyo's petition for review.

## BACKGROUND

### Factual and Procedural History

Richard Koyo is a citizen of the Democratic Republic of the Congo ("DRC"). He entered the United States through Ohio on June 7, 2006. On November 30, 2006, Koyo submitted an application for asylum, withholding of removal, and protection under the Convention Against

Torture. Koyo appeared before an asylum officer on January 24, 2007; the asylum officer found Koyo's testimony not credible and referred the case to an immigration judge. The Department of Homeland Security ("DHS") served Koyo with a notice to appear on January 26, 2007. Koyo admitted the factual allegations in the notice to appear, with the correction that he is a citizen of the DRC, and conceded removability.

Koyo's individual hearings began on January 20, 2011, and they continued through November 18, 2015. In addition to Koyo himself, three witnesses testified on Koyo's behalf: Fulgence Mundende Kage, Emile Kimbagni, and Kitele Ntontolo.

## A. Testimony Presented at Koyo's Hearings

Koyo was born in the DRC in March of 1959. He worked as a pastor in the Mission Church. In 1997, Laurent-Désiré Kabila launched a violent overthrow of the long-reigning dictator of the DRC, Mobutu Sese Seko. Koyo initially supported Kabila as an alternative to the dictatorship and human rights violations of Mobutu. One night in 1997, Mobutu soldiers broke into Koyo's house, beat him, beat and raped his pregnant wife, and stabbed him in the stomach.

Kabila began persecuting people from Rwanda, so Koyo hid and sheltered Rwandans in his church's basement in January 2000. Kabila soldiers came to his church, asked whether he was hiding Rwandans, ransacked his church, and severely beat him and left him in the woods. A passerby found Koyo and drove him home, but Koyo did not go to the hospital because it was not safe.

In May 2002, Koyo was again targeted by Kabila's soldiers.[1] Soldiers came to Koyo's house looking for him, and when they could not find him they beat his wife and broke everything in his house. The soldiers threatened to return, so Koyo and his family fled and hid at a friend's

---

[1] By this time, Laurent Kabila had been assassinated and his son, Joseph Kabila, had taken over.

house. Koyo believed the soldiers came because Koyo preached against Kabila's corruption and human rights abuses.

The next incident occurred in February 2006. Koyo was at work when four armed men approached the door. They asked if he was Pastor Richard, then attacked him, choking and beating him. The soldiers destroyed Koyo's office and warned him that he would be killed unless he stopped preaching against Kabila.

In April 2006, Koyo was again attacked while at a meeting of a group he founded to discuss human rights violations and prepare for upcoming DRC elections. Koyo awoke in the hospital after losing consciousness, where Koyo's friend Roberto Cobi told him that soldiers had attacked and beaten the congregation. Koyo had cuts and injuries on his face and arms, and his right eye was swollen. Koyo was later diagnosed with an eye injury by a doctor in the United States. Koyo stated that the soldiers attacked him because of Koyo's preaching against the human rights abuses and corruption of the Kabila government.

After the April 2006 attack, Koyo believed that Kabila's soldiers would kill him if he stayed in the DRC. Cobi agreed to help him leave the DRC. Cobi brought Koyo to Cobi's home in Luanda, Angola, where Koyo stayed for six weeks while Cobi arranged the passport and forms for Koyo to obtain a U.S. visa. Cobi brought Koyo to the U.S. Embassy in Luanda to get the visa and told Koyo to proceed under the name Ricardo. Koyo's visa was approved by the embassy, and he traveled to the United States. Koyo's wife and children fled to Brazzaville, Congo around the same time.

Koyo entered the United States through Cincinnati, Ohio on June 7, 2006. The immigration forms Koyo filled out on the airplane list his name as Ricardo Coio and his country of nationality as Angola. Upon arriving, Koyo returned the passport to Cobi. At one point, Koyo stated that the

passport and visa photographs were not of him, but he later stated that his photograph was in the passport and visa.

Koyo initially claimed that he had only travelled outside of the DRC once before April of 2006, on a 1998 trip to Brazzaville. However, Department of State records indicated that Koyo was fingerprinted under the name Ricardo Coio on September 12, 2005, in Luanda, Angola. Koyo's counsel instructed Koyo to invoke his Fifth Amendment right to not answer questions regarding whether Koyo had been to the U.S. Embassy in Angola more than once or whether he had traveled to other countries prior to 2006 other than his trip to Brazzaville. However, Koyo's wife wrote a letter in which she stated that Koyo fled to Angola in July 2005, returning to the DRC to resume preaching several months later. Koyo later admitted that he had briefly escaped to Angola in 2005. Koyo stated that he had previously denied going to Angola before 2006 because he had forgotten about the prior trip.

Two individuals, Emile Kimbangi and Pastor Ntontolo, testified regarding two letters written to help Koyo obtain a visa to visit the Grace Community Church in Raleigh, North Carolina. The first is a letter dated July 22, 2005 and addressed to the U.S. Embassy in Luanda, explaining that the Grace Community Church had invited Rev. Ricardo Coio to visit the church for three weeks in September 2005. The letter is written on Grace Community Church letterhead and is signed by Murry Haber, the pastor of Grace Community Church at the time.

The second letter is dated April 6, 2006, and includes a statement purportedly from Haber inviting Rev. Ricardo Coio to visit the Grace Community Church from May 7 to May 29, 2006. This letter is only addressed "to who [sic] it may concern." (Exhibit A, A.R. 568.) It is not signed, and it is not on church letterhead. The 2006 letter was apparently faxed to U.S. Immigration and Customs Enforcement in 2011 by the Grace Community Church document custodian, with the

note "[h]ope this helps." (*Id.* at 569.) The document custodian stated in a 2012 affidavit that she did not remember sending the fax and that she had no knowledge of the circumstances surrounding the 2006 draft letter, but that the letter is "a true and accurate copy of a draft letter that is in the computer files of Grace Community Church." (Exhibit B, A.R. 571.) Koyo's counsel objected to the introduction of the 2006 letter on the basis that it was not authenticated and its origins were unclear. The IJ admitted the 2006 letter, stating that the objection would "go to weight." (Hearing Transcripts, A.R. 513.)

Kimbangi and Ntontolo, who both knew Koyo through his ministry in the DRC, are married and have lived in the United States since 2000 and 1994, respectively. Each testified that they worked to help Koyo come to the United States. Kimbangi testified that she received telephone calls from acquaintances in April 2006 informing her that Koyo had been severely beaten and injured. She and Ntontolo asked Haber to invite Koyo to visit Grace Community Church in order to get Koyo out of the DRC. Ntontolo testified that beginning in 2004 or 2005, he received calls from an acquaintance in the DRC, Pastor Makila, telling Ntontolo that Koyo was in danger as a result of speaking out against the Kabila regime. Ntontolo stated that in 2005, Makila asked Ntontolo to help Koyo leave the DRC. Ntontolo drafted a letter on Haber's behalf inviting Koyo to visit Grace Community Church. Haber signed the letter, and Ntontolo mailed it. Ntontolo stated that after he sent the letter, he lost contact with Makila until late in 2006. At that time, Makila called Ntontolo to let him know that Koyo was on the way to the United States and to ask Ntontolo to help pick up Koyo at the airport. Ntontolo stated that he only drafted one letter for Haber's signature, and that Haber had never drafted or signed another letter on Koyo's behalf. Ntontolo identified the 2005 letter as the letter he had drafted and sent on behalf of Haber.

Haber also submitted an affidavit stating that the 2005 letter was the letter he sent at the request of Ntontolo. Haber stated that he had no recollection of the 2006 draft and that he did not know anything about the 2006 letter being faxed to ICE.

## B. Proceedings Below

In a written decision on June 6, 2017, the IJ found Koyo not credible "due to internal inconsistencies and inconsistencies between his testimony and other evidence in the record." (IJ Decision, A.R. 111.) The IJ based this determination on several factors. First, the IJ found that Koyo had not satisfactorily explained inconsistencies in his testimony regarding his 2005 trip to Angola or regarding whether the photographs in his passport and visa were pictures of him. Second, the IJ was concerned with Koyo's inability "to explain whether he visited Angola in 2005, how and why his fingerprints are the same as an individual's by the name of Ricardo Coio, and how his fingerprints were obtained in Angola in 2005, if he never left the DRC before 2006." (*Id.*) Third, the IJ found Koyo's testimony that he had not applied for a visa before 2006 inconsistent with the evidence suggesting that Haber and Ntontolo sent the letter inviting Koyo to the United States in 2005. The IJ found Koyo's witnesses credible but gave their testimony diminished weight due to inconsistencies between them. The IJ noted that Koyo "presented strong evidence that corroborates his account," but nevertheless found that Koyo had not met his burden of proving eligibility for relief. (*Id.* at 113.) The IJ found that the evidence provided "strong reason to believe" that Koyo is a citizen of Angola in addition to the DRC. (*Id.* at 114.) Based on these findings, the IJ denied Koyo's application for asylum. The IJ also denied withholding of removal under 8 U.S.C. § 1231(b)(3)(A) and the Convention Against Torture.

Koyo appealed the IJ's decision to the BIA, which dismissed Koyo's appeal on June 4, 2018. The BIA found that there was no clear error in the IJ's adverse credibility determination and

that Koyo's arguments were not persuasive. The BIA also found that because Koyo could not meet his burden of proof for asylum, he could not meet his burden of proof for withholding of removal. Finally, the BIA declined to overturn the IJ's denial of Koyo's request for protection under the Convention Against Torture.

## DISCUSSION

### Standard of Review

When this Court reviews a removal order denying asylum, withholding of removal, or CAT protection, the factual findings of the IJ and the BIA—including adverse credibility determinations—are reviewed for "substantial evidence." *Marouf v. Lynch*, 811 F.3d 174, 180 (6th Cir. 2016) (citation omitted). This is a "deferential standard: [a] reviewing court should not reverse simply because it is convinced that it would have decided the case differently." *Marikasi v. Lynch*, 840 F.3d 281, 287 (6th Cir. 2016) (citation omitted). Rather, findings of fact, including adverse credibility determinations, must be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Liti v. Gonzales*, 411 F.3d 631, 636 (6th Cir. 2005).

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, [the Court reviews] the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citing *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007)). "To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Id.* (citing *Patel v. Gonzales*, 470 F.3d 216, 218 (6th Cir. 2006)). This Court reviews

questions of law de novo. *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006) (citing *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004)).

## Analysis

### I. Evidentiary Burdens and Standards of Proof

Koyo applied for asylum, withholding of removal, and CAT protection. The Attorney General has discretion to grant asylum to applicants who meet the definition of a "refugee." 8 U.S.C. § 1158(b)(1)(A). A "refugee" is a person "who is unable or unwilling to return to her home country because of past persecution or a 'well-founded fear' of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013) (quoting 8 U.S.C. § 1101(a)(42)). To prevail on a petition for withholding of removal under the INA, 8 U.S.C. § 1231(b)(3), an applicant must demonstrate "that there is a clear probability that he will be subject to persecution" because of "race, religion, nationality, membership in a particular social group, or political opinion." *Khalili*, 557 F.3d at 435–36 (quotation marks and citations omitted). "An applicant seeking withholding of removal faces a more stringent burden than what is required on a claim for asylum." *Liti*, 411 F.3d at 640 (citation omitted). Finally, an applicant seeking CAT protection must show that "it is more likely than not that he or she would be tortured if removed[.]" *Shkulaku-Purballori v. Mukasey*, 514 F.3d 499, 503 (6th Cir. 2007) (quotation marks and citations omitted).

Applicants bear the burden of establishing eligibility for protection under the INA and the CAT. *See Marouf*, 811 F.3d at 188. Before determining whether an applicant meets the statutory criteria under the INA or the CAT, an immigration judge "make[s] a threshold determination of the alien's credibility." *Zhao v. Holder*, 569 F.3d 238, 243 (6th Cir. 2009) (citing *In re O-D-*, 21 I. & N. Dec. 1079 (BIA 1998)). An adverse credibility finding "precludes an applicant from

demonstrating either the well-founded fear of future persecution necessary to establish eligibility for asylum, or the 'clear probability' of future persecution necessary for withholding of removal." *Seo v. Holder*, 533 F. App'x 605, 615 (6th Cir. 2013) (citing *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009)); *see also Zhao*, 569 F.3d at 249 (finding that an adverse credibility finding also precludes relief under CAT). Although the law gives broad discretion to IJs in making credibility determinations, that discretion is not unlimited. "It does not permit a judge to 'cherry pick' facts or inconsistencies to support an adverse credibility finding that is unsupported by the record as a whole." *Marouf*, 811 F.3d at 182 (citation and alteration omitted).

Koyo does not contest the IJ's determination that his testimony was not credible. Instead, Koyo argues that the BIA erred by failing to adequately consider his independent corroborating evidence. According to Koyo, the independent evidence that he submitted corroborating his claims was sufficient to overcome the adverse credibility finding.

The BIA and the IJ adequately considered Koyo's corroborating evidence. The IJ explained that it found the testimony of Koyo's supporting witnesses, Kage, Kimbangi, and Ntontolo, credible, but that it gave their testimony diminished weight due to lack of first-hand knowledge and inconsistencies among their narratives. The IJ discussed other evidence that Koyo submitted, including letters of support corroborating Koyo's account of the 2006 attack, Koyo's DRC birth certificate, a letter from a doctor describing Koyo's eye injuries, and medical reports from the DRC describing Koyo's condition after the 1997 and 2006 attacks. The IJ explained:

> While [Koyo] presented strong evidence that corroborates his account, the Court notes that he bears the burden to prove his eligibility for relief under the Act. Given the plethora of evidence that both supports and undermines his account, as well as the strongly adverse credibility determination, the Court finds that [Koyo] has not met his burden and has not proven his eligibility for relief.

(IJ Decision, A.R. 113.) The record demonstrates that the IJ considered all the evidence before it when denying Koyo's application, not solely the adverse credibility determination.

The BIA recognized the IJ's determination that Koyo's corroborating evidence was insufficient to overcome the adverse credibility determination. The BIA stated: "contrary to the respondent's assertion, the Immigration Judge did consider the respondent's documentary submissions and witness testimony. . . . Based on this conflicting documentary evidence, the Immigration Judge made the reasonable inference that portions of the respondent's claim of persecution are untrue." (BIA Decision, A.R. 5.) Similarly, the BIA explained:

> [T]he Immigration Judge denied [Koyo's] asylum application for several reasons. Specifically, the Immigration Judge denied [Koyo's] asylum claim based on [Koyo's] internally inconsistent testimony and conflicts among and within the respondent's testimony, the testimony of his witnesses, and the respondent's documentary submissions. In addition, the Immigration Judge concluded that while some of [Koyo's] evidence supported his claim, some served to undermine it.

(*Id.* at 4.) The BIA was not required to specifically discuss each piece of evidence Koyo presented in support of his case. *Scorteanu v. INS*, 339 F.3d 407, 412 (6th Cir. 2003) (stating that the BIA "need not list every possible positive and negative factor in its decision") (internal quotation marks and citation omitted). Instead, "[w]hat is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id.* (quotations and citation omitted). The BIA considered Koyo's argument that the IJ had insufficiently addressed Koyo's corroborating evidence and determined that the IJ "made the reasonable inference that portions of [Koyo's] claim of persecution are untrue." (BIA Decision, A.R. 5.) The BIA specifically noted that Koyo failed to adequately answer questions about his possible Angolan citizenship: he could not explain the letter from his wife stating that they lived in Angola in 2005; he traveled on an Angolan passport; and

he had "twice indicated at the United States embassy in Angola that he was an Angolan citizen." (*Id.*) The BIA satisfied its obligation to consider Koyo's evidence.

Koyo additionally argues that the IJ and BIA erred in their analyses of Koyo's withholding of removal and CAT protection claims. An applicant seeking withholding of removal must demonstrate "that there is a clear probability that he will be subject to persecution" because of "race, religion, nationality, membership in a particular social group, or political opinion." *Khalili*, 557 F.3d at 435–36 (quotation marks and citations omitted). An applicant seeking CAT protection must show that "it is more likely than not that he or she would be tortured if removed[.]" *Shkulaku-Purballori*, 514 F.3d at 503 (quotation marks and citations omitted). Koyo argues that he can prevail on these claims despite his inability to sustain his burden of proof on his asylum claim due to the adverse credibility finding.

As explained above, Circuit precedent indicates that because Koyo's asylum claim fails due to the adverse credibility determination, Koyo cannot sustain his burden under the withholding of removal and CAT protection standards. *See, e.g., Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cr. 2014) ("An adverse credibility determination is fatal to claims for asylum and relief from removal, preventing such claims from being considered on their merits."); *El-Moussa*, 569 F.3d at 257. To support his argument that he may qualify for withholding of removal despite not qualifying for asylum, Koyo cites the Sixth Circuit case *Vakeesan v. Holder*, 343 F. App'x 117 (6th Cir. 2009). In that case, the Court stated that "an alien may prevail on a theory of future persecution despite an IJ's adverse credibility ruling as to past persecution, so long as the factual predicate of her claim of future persecution is independent of the testimony that the IJ found not to be credible." *Id.* at 125 (internal quotation marks and citation omitted). However, the Court in *Vakeesan* recognized that "[a]n alien who fails to establish that she is a refugee eligible for asylum under

- 11 -

8 U.S.C. § 1158 will necessarily fail to satisfy the 'clear probability' requirement for a withholding of deportation claim." *Id.* at 120 n.5 (citing *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004)). The IJ and BIA did not err in denying Koyo's claim for withholding of removal based on the fact that Koyo failed to meet his burden for asylum.

The BIA and IJ also did not err in their consideration of Koyo's CAT protection claim. When an applicant "has failed to satisfy the threshold showing of credibility to warrant withholding of removal under the [INA], it logically follows that he cannot demonstrate that he is entitled to relief under the CAT." *Zhao*, 569 F.3d at 249; *see also El-Moussa*, 569 F.3d at 257; *Hassan v. Gonzales*, 403 F.3d 429, 435 (6th Cir. 2005). "As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach." *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (citations omitted). The BIA and IJ did not err in rejecting Koyo's CAT protection claim.

## II.     The 2006 Letter

At Koyo's immigration hearings, the government submitted the 2005 and 2006 letters as evidence. Koyo's counsel objected to the submission of the 2006 letter. Koyo's counsel argued that the letter should not have been admitted because it was "not properly authenticated in any way." (Hearing Transcript, A.R. 511.) The IJ admitted the 2006 letter over Koyo's counsel's objection. Koyo argues before this Court that admission of the 2006 letter violated his due process rights.

An individual asserting due process violations in a removal hearing must demonstrate both that there was a defect in the removal proceeding and that the individual was prejudiced by that defect. *See Bi Qing Zheng v. Lynch*, 819 F.3d 287, 296 (6th Cir. 2016) (citing *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). This Court "need not address the merits of a claim if there is

no demonstration of prejudice. Moreover, to establish the requisite prejudice, [an individual] must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of those violations." *Graham v. Mukasey*, 519 F.3d 546, 549–50 (6th Cir. 2008) (internal citation omitted) (citing *Garza-Moreno v. Gonzales*, 489 F.3d 239, 241–42 (6th Cir. 2007)).

Koyo's due process claim fails because he cannot show prejudice. There is no indication that the outcome of the case would have been different if the IJ had not admitted the 2006 letter into evidence. The only comment the IJ made in its decision regarding the 2006 letter was to note that "[t]hroughout the final hearings in this case, the Court was puzzled by [Koyo's] and Mr. Ntontolo's assertions that the letter dated in 2006 from Pastor Haber was somehow not genuine, and their accusations against the DHS counsel." (IJ Decision, A.R. 112.) The IJ instead focused its discussion on the 2005 letter, and it based its decision on "inconsistencies between [Koyo's] testimony, the testimony of Mr. Ntontolo, and the documentary record." (*Id.*)

The 2006 letter also did not play any role in the BIA decision. The BIA's only mention of the 2006 letter was in a single footnote, stating that the BIA was not considering the 2006 letter in its analysis. The BIA instead discussed the IJ's decision finding it implausible that the 2005 letter, which invited Koyo to visit Grace Community Church in September 2005, could be used as a basis for Koyo's 2006 visa request. Koyo is unable to demonstrate that he was prejudiced by the introduction of the 2006 letter, as neither the IJ nor the BIA relied on the 2006 letter in denying Koyo's application. Because Koyo cannot demonstrate prejudice, his due process claim fails.

## III. Citizenship

Based on Koyo's testimony and the evidence presented, the IJ found that "there is strong reason to believe [Koyo] is, at a minimum, also a citizen of Angola." (IJ Decision, A.R. 114.) An

individual with dual nationality does not qualify for asylum unless that individual is able to demonstrate a fear of persecution in both countries. *Matter of B-R-*, 26 I. & N. Dec. 119, 122 (BIA 2013). The IJ found that Koyo's inability to establish his citizenship, in addition to the adverse credibility finding, prevented Koyo's asylum application from succeeding.

Koyo argues that the BIA did not adequately respond to his argument that he had established that he was a citizen of the DRC. Koyo also asserts that the government has not established that he is a citizen of Angola. Koyo's arguments are unavailing. The BIA adequately addressed the evidence relating to Koyo's citizenship; it was not required to "list every possible positive and negative factor in its decision." *Scorteanu*, 339 F.3d at 412 (citation omitted). The BIA recognized that Koyo submitted a birth certificate from the DRC and a letter from his mother stating that he was a citizen of the DRC. The BIA also discussed Koyo's visa applications indicating that he was an Angolan citizen, Koyo's statements to embassy personnel in Luanda that he was an Angolan citizen, and the fact that Koyo did not answer questions that would have helped address his possible Angolan citizenship. The BIA's decision shows that "it consider[ed] the issues raised, and [it] announce[d] its decision in terms sufficient to enable [this Court] to perceive that it has heard and thought and not merely reacted." *Id.* (quotations and citations omitted).

## CONCLUSION

Because the BIA and IJ adequately considered the evidence before them in denying Koyo's application for asylum, withholding of removal, and CAT protection, we **DENY** Koyo's petition for review.